IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| JACK MARSHALL KNIGHT, JR., | ) | |
| | ) | |
| CLAIMANT, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 2:15-CV-2041-KOB |
| NANCY A. BERRYHILL, | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| RESPONDENT. | ) | |
| | ) | |
| | ) | |

MEMORANDUM OPINION

I. INTRODUCTION

On October 30, 2012, the claimant, Jack Marshall Knight, Jr., applied for disability

insurance benefits and supplemental security income under Titles II and XVI of the Social

Security Act. He alleged disability beginning June 10, 2010, because of severe neck and cervical

spine injuries; anxiety disorder; and depression. The Commissioner denied the claimant's

applications on March 5, 2013. The claimant filed a timely request for a hearing before an

Administrative Law Judge, and the ALJ held a hearing on March 20, 2014. (R. 1-8, 141-49,

219).

In a decision dated July 10, 2014, the ALJ found that the claimant was not disabled as

defined by the Social Security Act and was, therefore, ineligible for social security benefits. On

September 11, 2015, the Appeals Council denied the claimant's request for review.

Consequently, the ALJ's decision became the final decision of the Social Security

Administration. The claimant has exhausted his administrative remedies, and this court has

jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). (R. 5-8, 9-24). For the reasons stated below, this court will reverse and remand the decision of the Commissioner.

## II. ISSUES PRESENTED

Whether the ALJ's reasons for discrediting the claimant's statements regarding the intensity and limiting effects of his pain lack substantial evidence.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the ALJ's decision if he applied the correct legal standards and if substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No ... presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations de novo. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors, "are not medical opinions, ... but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets a Listing and is qualified for Social Security disability benefits is a

question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months...." 42 U.S.C. § 423(d)(1)(A). To make this determination the Commissioner employs a five-step, sequential evaluation process:

    (1) Is the person presently unemployed?
    (2) Is the person's impairment severe?
    (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
    (4) Is the person unable to perform his or her former occupation?
    (5) Is the person unable to perform any other work within the economy?

    An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

In evaluating pain and other subjective complaints, the Commissioner must consider whether the claimant demonstrated an underlying medical condition, and *either* (1) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). The ALJ may consider the claimant's daily activities in evaluating and discrediting complaints of disabling pain. *Harwell v. Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984).

If the ALJ decides to discredit the claimant's testimony regarding his pain and other symptoms, he must articulate explicit and adequate reasons for that decision. *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995). If substantial evidence does not support the ALJ's credibility finding, the ALJ commits reversible error. *Foote*, 67 F.3d at 1562.

## V. FACTS

The claimant was fifty-nine years old at the time of the ALJ's final decision. He graduated from high school, completed one year of college, and has past relevant work as a customer service representative and a sales attendant. He alleges disability based on severe neck and cervical spine injuries; anxiety disorder; and depression. (R. 219-20).

*Physical and Mental Impairments*

The claimant's back issues began in 1995 when he underwent a cervical fusion at C6-C7; he had another cervical fusion in 1999 at C5-C6 at St. Vincent's Hospital. (R. 499). Then, in June 2003, the claimant was involved in a motor vehicle accident in which he fractured his cervical spine at C3. Dr. Katherine Medley at UAB Hospital treated the claimant and noted that his hardware from his previous surgeries were in tact; he had left knee tenderness but no effusion; x-

rays showed no hand, knee, or leg fractures; and he had no soft tissue swelling. Dr. Medley treated the claimant with narcotic medications for pain and a hard cervical collar.

At his follow-up at UAB Health Centers with Dr. Amy LeJeune on July 24, 2003, she noted that the claimant had been taking Ativan for some withdrawal symptoms he had while trying to discontinue the narcotic medications prescribed after his June car accident. Dr. LeJeune noted that the claimant indicated hip pain, but had full range of motion in his hip with no tenderness. At another follow-up with Dr. LeJeune on October 6, 2003, the claimant's main complaint was his increased anxiety, for which Dr. LeJeune prescribed Paxil and Xanax, which the claimant was to take "sparingly" with no refills. (R. 372-73).

From 2003 to 2008, the medical record is sparse. However, on April 14, 2008, the claimant was involved in another motor vehicle accident. Dr. Wilson at St. Vincent's Hospital reported that the claimant suffered a cervical sprain, but the CT of his spine was normal and showed no changes from the 2003 MRI. (R. 505-508).

In June 2008, Dr. Eric Solomon with Oak Mountain Family Practice Center began treating the claimant as his primary care physician. On June 9, 2009, the claimant reported that he suffered from depression and severe neck pain. By December 23, 2009, Dr. Solomon referred the claimant to pain management for his chronic neck pain.

Again on January 9, 2010, the claimant was involved in yet another motor vehicle accident that caused neck and back pain. Dr. Bobby Lewis at the UAB Hospital Emergency Room treated the claimant and listed the claimant's "current medications" as Xanax and Cymbalta. Dr. Lewis found that the claimant's cervical collar was in place but he had cervical muscle tenderness; he had no palpable tenderness in his lower back; his CT scans of his cervical, thoracic, and lumbar spine were normal; and his previous hardware from his spine surgeries were

in tact. The records from that date indicate that the claimant tested positive for amphetamines, benzodiazepines, and opiates; his wife told the doctor that the claimant had "left over Lortab at home, which he has probably taken." Dr. Lewis prescribed the claimant Lortab and Flexeril.

On Dr. Solomon's referral, the claimant saw Dr. Nitin Chhabra, a pain specialist at Birmingham Pain Center, on January 18, 2010. The claimant reported that his neck pain radiates into his bilateral shoulders; he has tremors at rest in his right hand; pain is worse in the morning; he has to sleep in a recliner; and neck flexion makes his pain worse. He rated his pain between a 2 or 3/10 at its best and a 9 to 10/10 at its worst; indicated he has had no epidural steroid injections; and stated he used a TENS unit and Advil or Aleve for his pain. He reported that physical therapy, the TENS unit, massage, heat, narcotics, and hot tubs make his pain better.

Regarding his daily activities, the claimant told Dr. Chhabra that he can walk and sit indefinitely, but that sitting and looking down at his computer make his pain worse, and he can occasionally do "household duties." He complained of headaches, depression, relationship difficulty, anxiety, poor appetite, weight loss, and loss of interests. He told Dr. Chhabra that a friend had given him one of his Roxicodone to try and it worked great and that his surgeon refused to treat his pain anymore because "evidently doctors discovered the claimant obtained narcotics from multiple emergency departments." (R. 437).

Dr. Chhabra's physical examination of the claimant revealed decreased range of motion in his cervical spine with flexion and extension and lateral rotation; decreased sensation to light, touch, and temperature in the C6 dermatomal distribution on the right; normal hand function; and normal muscle strength and range of motion in his upper body. Dr. Chhabra diagnosed the claimant with cervical post laminectomy syndrome, and, as part of his treatment plan, Dr.

Chhabra indicated he would schedule the claimant for a cervical epidural steroid injection; start him on 10mg Percocet; and give him samples of Lyrica.  (R. 437-40).

Notes from the Birmingham Pain Center on February 1, 2010 indicate that Jay Heisler, PhD consulted with Dr. Chhabra about the claimant. Dr. Chhabra stated that because of the claimant's "significant OT/ER meds," possible psychiatric needs, and treatment complexities, he could not adequately treat the claimant at the Birmingham Pain Center. The notes reveal that Dr. Chhabra believed the claimant's best interests would be served by a "total transfer to Doleys Clinic or other facility."  (R. 402).

Just a few days later on February 5, 2010, Dr. Solomon's notes indicate that he told the claimant to go the emergency room because was taking 10 mg of Percocet ten times a day and wanted phenobarbital for his withdrawal symptoms.  (R. 547).  From February 2010 through September 2010, the claimant saw Dr. Solomon approximately four times and continued to report severe back pain.  (R. 543-46).

The record is unclear when the claimant began treatment at the Doleys Clinic at the Pain and Rehabilitation Institute, but treatment notes from April 28, 2011 indicate that the claimant saw Dr. Christopher Hill at the Doleys Clinic on that date for a follow-up appointment for "chronic neck pain and right upper extremity pain."  The claimant described his pain as "constant, aching, and sore" and as "worse" at a 7/10 on the pain scale; has a "75% reduction in his chronic pain with his current medicine"; but has diarrhea, sleeplessness, anxiety, and irritability, which Dr. Hill attributed to the claimant's "overuse" of his medication.  Dr. Hill increased the dosing to the "maximum strength" and prescribed 30 mg of Roxicodone six times a day because the claimant required an increase in pain medication for relief.  Dr. Hill stressed the

importance of the claimant following the plan of care to control his pain and warned him that a violation of that plan of care would result in discharge from the clinic. (R. 496-97).

At his follow-up appointment with Dr. Hill on July 21, 2011, the claimant reported continued pain in his neck and upper back, but stated that the 30 mg of Roxicodone six times a day was working well; his pain on that date was a 1/10; and that he "gets 95-100% reduction of his chronic pain with his current pain management," although he complained of constipation and sweating. (R. 495).

The claimant called Dr. Hill's office on October 6, 2011 and reported that he accidentally dropped 100 pills in the toilet, but that he would have enough pills left to take 2 ½ pills a day until his next appointment. However, at the next follow-up appointment with Dr. Hill on October 19, 2011, the claimant reported a 9/10 on the pain scale in his neck and right upper extremities. Because he was short on Roxicodone pills, the claimant admitted to taking Lortab that his wife had left over and self-increased his Xanax from 1 to 2 mg many times a day. Dr. Hill suggested his wife distribute his medications for him and limited his next prescription to five days of 30 mg Roxicodone at six doses per day. (R. 493).

Notes from a follow-up visit with Dr. Hill on January 12, 2017 indicate that the claimant took "left over" Suboxome for pain that "precipitated such an abrupt withdrawal" that he was hospitalized on January 4, 2012. The claimant reported that his family has "criticized" him for the use of opioids for his pain and he "felt compelled to wean himself off," which resulted in an increase in his pain "to such a degree that it has made work difficult for him." Dr. Hill and Dr. Doleys, who consulted with Dr. Hill on this date, agreed that the claimant should receive only a minimum amount of pain medication until the next visit and prescribed 30 mg Roxicodone three times daily. (R. 491-92).

On January 17, 2012, the claimant saw Physician's Assistant Ronald E. Philley at Neurosurgical Associates in Anniston complaining of chronic back pain. The claimant reported that he tried to "detox" recently and developed increased back pain; denied any "radicular leg pain or weakness"; and stated he had occasional numbness in both heels with prolonged standing. When he started taking his medications again at "half strength," his "back pain has resolved." He reported his current medications as oxycodone, Advil, and Xanax. PA Philley's physical exam revealed a full range of motion in the claimant's neck with no pain; 5+ strength globally; a steady gait; a negative straight leg raise test; appropriate muscle bulk and tone; and no upper motor neuron signs. (R. 510).

At the request of the claimant's attorney, Dr. Solomon wrote a letter on February 19, 2017 regarding his treatment of the claimant. Dr. Solomon reported that he had treated the claimant for chronic pain since 2008; that the claimant is "under the care of a chronic pain doctor"; that psychiatrist Dr. Nelson[1] was treating the claimant's chronic anxiety; and that Dr. Solomon considered the claimant to be "totally disabled." (R. 515).

The claimant returned to the Doleys Clinic on February 20, 2012 for a follow-up appointment with Dr. Hill and reported his pain at a 5/10 on the pain scale. Dr. Hill prescribed 30 mg Roxidodone at four does per day. On that same day, the claimant met with Clinical Psychologist Leanne R. Cianfrini at the Doleys Clinic. Dr. Cianfrini reported that the claimant has been "strictly adhering" to his medication plan with the Roxicodone; noted that the claimant stated that pain medication helps with relief "but only lasts 4-5 hours"; and noted that the claimant uses 1.5 of the 2 mg of Xanaz per day when the pain returns before his next Roxicodone dosage. Dr. Cianfrini described the claimant has having an "ok" mood; flat affect; and "strong pain and anxiety." (R. 489-90).

---

[1] The court can find no medical documents in the record from "Dr. Nelson."

At a follow-up appointment with Dr. Hill, the claimant reported he was taking his medications as prescribed and that they were helping but he was not "100% satisfied" with his pain relief. Dr. Hill increased the claimant's prescription to 30 mg Roxicodone five times daily and continued the prescription for 2 mg of Xanax daily. (R. 488).

The claimant saw Dr. Cianfrini for a follow-up on August 21, 2102. Dr. Cianfrini noted the claimaint's positive drug screen for Buprenorphin; stated that the claimaint "does not seem to understand that it's not ok to self-adjust---he wants to 'get rid of pain'"; and indicated that the claimant blames the doctors for "undertreating" his pain. That same date, Dr. Hill wrote a letter to the claimant "withdrawing from further medical care" because of his non-compliance with the medical agreement regarding his medications. (R. 485-86).

The claimant returned to PA Philley at Neurosurgical Associates on October 23, 2012, complaining of neck and lower back pain and seeking a referral for pain management. The notes indicate that the claimant "continues to undergo psychiatric therapy" with Dr. Nelson. PA Philley's physical examination revealed a steady gait; 5+ strength; grossly intact sensation; diffuse paraspinal muscular pain; and no upper motor neuron signs. He gave the claimant a pain management referral and refilled his pain medication until the claimant could get into pain management. (R. 512).

On December 12, 2012, the claimant saw Dr. Michael Kendrick at Southside Pain Specialists for an initial consultation. Dr. Kendrick reviewed the claimant's past medical records from Dr. Wilson and Dr. Hill and recounted the claimant's thorough pain management history in his treatment notes. The claimant reported that his pain was an 8/10 on the pain scale on that date; that quick lateral rotations and extension and flexion of his neck aggravate his pain; that lying down, lifting, and pushing or pulling increases his pain; and that he has occasional

weakness in his arms. Dr. Kendrick's physical exam of the claimant showed that he had"[a]ppropriate pain related behaviors (guarded movements)"; was wearing a soft cervical spine collar; and had a slow, antalgic gait. Dr. Kendrick discussed with the claimant his past discharge from the Doleys Clinic for self-medicating and emphasized the importance of following the opioid treatment agreement. Dr. Kendrick prescribed 60 mg Oxycontin, extended release, to take every eight hours for thirty days; one 30 mg Oxycodone tablet to take with the starting dose of Oxycontin; and 300 mg Neurontin to take daily.

   The claimant completed a Function Report on December 11, 2012, at the request of the Social Security Administration. In that report, the claimant indicated that he does not prepare his own meals but his wife prepares them; that he used to microwave already prepared items but he does not do so now because of the straining involved in reaching the dishes and cabinets; and that he can put his laundry in the hamper. (R. 202-09).

   At the request of the Disability Determination Services, Dr. Richard Whitney examined the claimant's medical records and completed a "Physical Residual Functional Capacity Assessment" on January 18, 2013. Dr. Whitney found that the claimant could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk about six hours in an eight-hour workday; push and/or pull with no limitations; never climb ladders, ropes, or scaffolds; climb ramps or stairs, balance, stoop, kneel, and crouch with no limitations; occasionally crawl; reach overhead with limitations; handle, finger, feel with no limitations; and never work around hazardous machinery or unprotected heights. (R. 63-65).

   At a follow-up appointment with Dr. Kendrick on February 6, 2013, the claimant rated his neck and back pain as an 8/10 on the pain scale; stated that "his medication regimen is not controlling his pain"; and wanted to discuss increasing his dosage or adding something for

"breakthrough pain."  Dr. Kendrick's physical examination revealed that the claimant's cervical spine had muscle spasms and tenderness with palpation; he was wearing a soft cervical spine collar; and he had a slow, antalgic gait.  Dr. Kendrick noted that the claimant reported that someone stole some of his Xanax and Oxycontin pills; that he believed he knew who stole them; and that he stretched out his medication to try to make it to his appointment. Dr. Kendrick instructed the claimant to get a lock box; did not prescribed any additional medication for breakthrough pain; and prescribed the same medications as before but told the claimant that any further non-compliance "will result in immediate dismissal."  (R. 578-80).

On February 21, 2013, at the request of the Social Security Administration, psychiatrist Dr. Robert Estock reviewed the claimant's records and completed a Psychiatric Review Technique.  With no explanation other than a review of the records, he found that the claimant had mild limitations in activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  (R. 61-61).

The claimant returned to Dr. Kendrick on March 5, 2013, and reported his pain at an 8/10 on the pain scale.  The treatment notes indicate that the claimant called Dr. Kendrick's office on March 1, 2013 and asked if he could use some Lidoderm patches he had from an old prescription, and Dr. Kendrick approved him doing so.  The claimant stated that his medication dosage was not effective for his pain, which was interfering with his part-time job; that he continues to experience drowsiness during the day from the Neurontin; and that he would like a new prescription for a TENS unit because his was no longer working.  The claimant admitted to taking one extra OxyContin pill a day for about a week after increased pain from "strenuous work unloading his truck."

Dr. Kendrick's physical examination of the claimant revealed diminished motion and rotation in his cervical spine; muscle atrophy or decrease in his muscle mass; and a slow, antalgic gait. Dr. Kendrick noted that the "risk of continuing [the claimant] on opioids is substantial" given his noncompliance and overuse of medications on several occasions. He noted that he would send the claimant for an addiction risk assessment; continue him on OxyContin and Neurontin; prescribe Lidoderm; and order a neuro-muscular stimulator for the cervical pain because the claimant has muscle atrophy. Dr. Kendrick warned the claimant that any further noncompliance would result in discharge from the pain clinic and a referral for active substance abuse treatment. (R. 571-74).

On February 14, 2013, at the request of the Social Security Administration, the claimant underwent a psychological evaluation with clinical psychologist Dr. Sharon Waltz, who also reviewed the claimant's prior mental health records provided by the Social Security Administration. Dr. Waltz noted the claimant's anxious mood and affect; good memory; normal thought processes; and fair insight and judgment. Under "Daily Activities," Dr. Waltz noted that the claimant drives occasionally; does "limited cooking, cleaning, and laundry"; mostly stays at home; and has "functional restrictions related to his physical and mental health issues." (R. 567).

Dr. Waltz diagnosed the claimant with Generalized Anxiety Disorder and Depressive Disorder, NOS, with dependent features; neck injuries with surgeries; and problems related to mental and physical health. She assessed his mental prognosis over the next year as "fair" and deferred his physical prognosis to his medical physician. Dr. Waltz noted that the claimant was motivated and cooperative during the exam; that he cannot manage financial benefits independently; has "mental impairment present to a moderate degree"; has "constriction of interests and difficulties relating to others due to mental health symptoms"; and can "function

primarily independently with assistance."  She concluded that the claimant's ability to "understand, to carry out and to remember instructions and to respond appropriately to supervision, co-workers and work pressures in a work setting, despite his impairments is fair to good. He is currently working part-time."  (R. 567-68).

*The ALJ Hearing*

*The Claimant's Testimony*

The ALJ held a hearing on March 20, 2014, in which the claimant testified that he had been unemployed since around March or April of 2013.  He worked for AT&T for thirty-six years, until he took early retirement rather than being terminated from his job because his pain medications made him fall asleep at his desk at work.  After retiring from AT&T, a friend of his gave him a part-time job at a Kangaroo convenient store as a coffee host, which required him to stand on his feet.  His manager allowed him to use a stool to help relieve the pressure that standing put on his neck and shoulders. The claimant testified that he was working at Kangaroo when he applied for disability, but he has since stopped working because his pain prevented him from performing his job duties.  (R. 29, 33, 40).

The claimant testified that he was in pain management until October of 2013 when Dr. Kendrick terminated him because his drug screen showed a trace of a medication for which he had no prescription.  He has not sought "to get back into pain management because I find it better that I'm clear-minded, I can think. They had me doped up all the time. I feel like I pretty much was an addict."  (R. 32).

During the hearing, the claimant wore his cervical collar and testified that a doctor prescribed it, but he could not remember which doctor.  He asked to stand up during the hearing because he was uncomfortable in one position for too long. (R. 34-35, 38).

The claimant stated he could not work because he does not have the physical strength to pick up anything that weighs over five or ten pounds because of the stress on his neck that causes "unbelievable" pain. He has pain when he moves his neck from one side to the other, and he has to use his whole body to look right or left if he drives a car, so his family will not let him drive. The claimant stated he has loss of dexterity and strength in both arms, but mostly in his right arm, which limits his ability to write. The nerve loss and pinched nerves in his arm limit his ability to grip and control with his hands. Cold temperatures make his pain worse. Warm moist heat, massages, and the TENS unit help but do not alleviate his pain. (R. 40-43).

The claimant's attorney began to ask the clamant to describe his typical day with his pain, but the ALJ disallowed that testimony and said "without a medical restriction, what someone chooses to do may not be what they're functionally capable of doing. So I don't see anything that would be gained" by allowing that testimony. (R. 43).

*The Vocational Expert's Testimony*

A vocational expert, William Crunk, Ph.D., testified concerning the type and availability of jobs the claimant could perform. Dr. Crunk testified that the claimant's past relevant work was as a customer service representative, classified as sedentary, skilled work; and a sales attendant, classified as light, unskilled work.

The ALJ asked Dr. Crunk to assume a hypothetical individual the same age, education, and experience as the claimant who can perform work at a light level of exertion with the following additional limitations: could not climb ladders, ropes, or scaffolds; could not work around hazards; and could occasionally crawl. Dr. Crunk responded that such an individual could perform the claimant's past work as a customer service representative or a sales attendant. Dr. Crunk also testified that individual could also work at light, unskilled jobs such as a bakery

worker, with 180,000 jobs in the nation and 2,000 in Alabama; an office helper, with 186,000 jobs in the nation and 1,700 in Alabama; or an information clerk, with 215,000 jobs in the nation and 2,100 jobs in Alabama. (R. 47-48).

The claimant's attorney asked Dr. Crunk whether a person's limited range of motion in his neck would affect his ability to perform the baker worker position, to which Dr. Crunk replied that such a limitation could affect the individual's ability to move side to side. The attorney then asked Dr. Crunk to consider the same hypothetical offered by the ALJ, except that the individual had moderately severe or severe chronic neck pain. Dr. Crunk stated that such an individual would not be capable of performing any full-time work because of difficulty concentrating and excessive absenteeism and excessive breaks. Dr. Crunk also testified that a person on medication that causes drowsiness and inattentiveness would not be able to maintain employment of any kind. (R. 49-50).

*The ALJ's Decision*

On July 10, 2014, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through December 31, 2016, and had not engaged in substantial gainful activity since his alleged onset date of June 30, 2010. (R. 21).

Next, the ALJ found that the claimant had the severe impairments of "status post 1995 C6-7 fusion and status post 1999 C5-6 fusion." However, the ALJ found the claimant's anxiety disorder, depressive disorder, and overuse of prescription pain medication non-severe because they do not have more than a "minimal effect" on the claimant's ability to work. In doing so, the ALJ noted that the claimant "mostly treated" his anxiety with psychotropic medication; had no ongoing history of mental health treatment by a psychiatrist or in a mental health center; and had

never received hospitalization or emergency room treatment for a "debilitating mental disorder." The ALJ also noted Dr. Waltz's opinion that the claimant's mental impairment was only "moderate." (R. 15-16). Giving great weight to Dr. Estock, the state consulting physician, the ALJ found that the claimant had only mild limitations in his activities of daily living; social functioning; concentration, persistence, and pace; and no episodes of decompensation. (R. 15-16).

The ALJ next found that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 16-17). The ALJ determined that the claimant has the residual functional capacity to perform light work within the additional limitations of never climbing ladders, ropes, or scaffolds and occasionally crawling. (R. 17-18).

In making this finding, the ALJ considered the claimant's symptoms and corresponding medical record, including medical source opinions. The ALJ concluded that, although the claimant's medically determinable impairments could reasonably be expected to cause his symptoms, the claimant's allegations regarding the intensity, persistence, and limiting effects of those symptoms were not fully credible when compared with the evidence. The ALJ gave little weight to the claimant's own testimony about his limitations caused by his pain.

After recounting the medical evidence in the record as the court has previously set out in the fact section, the ALJ articulated three reasons he gave the claimant's allegations of the severity of his pain little weight: the claimant admitted increased pain to Dr. Kendrick in March 2013 but only after engaging in strenuous work activity—unloading his truck; the claimant stated in his Function Report that he could not do household chores or cook meals because of his pain, but he told Dr. Waltz two months later that "he was able to cook, clean, and do laundry"; and the

claimant self-adjusted his medications and requested additional pain medication because his medications were stolen. (R. 19).

The ALJ gave treating physician Dr. Solomon's opinion little weight because the opinion that the claimant is "disabled" is a decision reserved for the Commissioner and because "his opinion is not supported by the medical evidence of record," although the ALJ did not explain how the medical evidence did not support Dr. Solomon's opinion. The ALJ gave Dr. Whitney's consulting opinion significant weight and stated that, even though Dr. Whitney did not examine the claimant, he gave specific reasons for his residual functional capacity opinion and is familiar with the disability program and its requirements. (R. 19-20).

Although Dr. Wilson, Dr. Hill, and Dr. Kendrick did not offer opinions concerning the claimant's functional limitations, the ALJ gave their medical records substantial weight because they were "useful in determining the full scope of the claimant's impairments." (R. 20).

Next, the ALJ, relying on the vocational expert's testimony, found that the claimant could perform his past relevant work. The ALJ also determined that, based on the claimant's age, education, work experience, residual functional capacity, and the vocational expert's testimony, other jobs existed in significant number in the national economy that the claimant could perform. The ALJ found that the claimant had the residual functional capacity to perform the requirements of unskilled occupations at the light level of exertion, such as a bakery worker, office helper, and informational clerk. Thus, the ALJ concluded that the claimant was not disabled as defined under the Social Security Act. (R. 20-21).

# VI. DISCUSSION

The claimant argues that the ALJ's reasons for discrediting his subjective complaints of the severity of his pain lack substantial evidence. The court agrees. Substantial evidence does not support the ALJ's reasons for discounting the severity and limiting effects of the claimant's chronic pain.

Applying the pain standard, the ALJ found that the objectively determined medical condition of cervical neck fusions at C5-6 and C6-7 could reasonably be expected to cause the claimant's symptoms. *See Holt*, 921 F.2d at 1223. However, the ALJ found the claimant's statements concerning the intensity, persistence, and limiting effects of his pain were not "fully credible." The ALJ articulated several reasons for his credibility finding, but all of those reasons lack merit.

The ALJ found that the claimant's pain was not as severe as he alleged because Dr. Kendrick noted the claimant had increased pain in March 2013 only after engaging in strenuous activity. The claimant's attempt on one occasion to do something beyond his physical capability that increased his pain does not negate his complaint for years of severe pain. The claimant continuously engaged in pain management treatment since 2010 because of his cervical spine and related pain. The pain specialists who treated him for many years with strong pain medications for chronic pain found objective medical signs of severe pain during physical examinations, including tenderness to palpation; diminished motion and rotation of his cervical spine; muscle atrophy; and a slow, antalgic gait. One attempt to unload something from a truck does not discredit that the claimant has severe pain that limits his ability to work full-time.

The ALJ also discredited the claimant's pain allegations because he indicated in his Function Report in December 2012 that he could not do household chores or cook meals, but

told Dr. Waltz in February 2013 that "he was able to cook, clean, and do laundry." However, the ALJ mischaracterized the facts. In his Function Report, the claimant indicated that his wife cooked his meals; that he finds difficult and avoids heating up prepared meals for himself because he has to reach overhead to get dishes and reach cabinets; and he can put his laundry in the hamper. The claimant did not contradict himself when he reported his daily activities to Dr. Waltz. What the claimant actually told Dr. Waltz is that he does "*limited* cooking, cleaning, and laundry [and] mostly stays at home." (R. 567) (emphasis added). The ALJ's opinion infers that the claimant went from not being able to do anything at all to being able to cook, clean, and do laundry on a regular and unlimited basis. That inference is wrong. Moreover, the claimant's ability to do such limited tasks on a limited basis does not mean that he has no pain and can engage in gainful employment.

Equally as troubling to this court is the ALJ's refusal to allow the claimant's lawyer at the hearing to solicit testimony about the claimant's daily routine and activities at that time. Instead of allowing the claimant to testify at the hearing as to the limiting effects of his pain on a daily basis, the ALJ found that nothing would be "gained" by allowing such testimony. Instead, in his opinion the ALJ picked statements about what the claimant could and could not do in December 2012 and February 2013, mischaracterized those statements, and used them to discredit the claimant. The court finds that much would have been "gained" from the ALJ allowing relevant and important testimony at the hearing about the claimant's limiting effects of his chronic pain on a daily basis.

Another reason the ALJ gave for discrediting the claimant's subjective allegations of the severity and limiting effects of his pain involved the claimant's self-adjusting and overuse of his pain medications. That reason also lacks substantial evidence. The court agrees that the record

contains evidence that the claimant did not follow his pain medication plan and that, at the time of the hearing, he had been discharged from pain management months prior. And the ALJ found that the claimant's "prescription medical overuse" did not cause more than a "minimal limitation" on his ability to perform basic mental tasks. However, the claimant's overuse of pain medication to help decrease his pain does not negate that he suffered from severe pain. In fact, his self-adjustment of his medications and overuse could support that he in fact felt severe pain despite the use of potent pain medications for years. The claimant worked the same job for over thirty-five years; tried to continue that job while suffering from severe pain; and worked part-time at a different job as long as he could while on those strong pain medications that made him feel like he was "doped up" all the time. The ALJ's reliance on the claimant's overuse of pain medications as reason to find that he did not have severe pain does not rise to the level of substantial evidence to discredit his subjective allegations of severe pain.

The court finds that the reasons the ALJ gave to discredit the claimant's subjective allegations of disabling pain lack substantial evidence.

*Other concern*

The court is also concerned about the ALJ's lack of non-exertional limitations for the claimant in either the hypothetical to the vocational expert at the hearing or in the ALJ's finding regarding the claimant's residual functional capacity. Consulting, examining psychologist Dr. Waltz, to whom the ALJ gave great weight, found that the claimant's mental impairments from his anxiety caused *moderate* limitations in February 2013 and that his prognosis was "fair." Dr. Waltz found that the claimant would be unable to manage his financial benefits independently and had moderate mental limitations, including difficulty relating to others because of his mental health symptoms. Dr. Waltz's findings, to which the ALJ stated he gave substantial weight,

warrant the ALJ to account for at least some type of non-exertional limitation in both the hypothetical to the vocation expert and in his ultimate residual functional capacity determination.

Moreover, the ALJ found the claimant's anxiety disorder non-severe in part because he failed to seek ongoing treatment on a regular basis from a psychiatrist. However, the record mentions several times that the claimant sought mental health treatment from at least 2012 to 2013 with Dr. Nelson, but does not contain any treatment notes from visit with Dr. Nelson. (R. 515, 571). On remand, the ALJ should ensure a complete and thorough record of the claimant's prior mental health treatment with Dr. Nelson.

## VII. CONCLUSION

For the above reasons, this court concludes that the ALJ's reasons for discrediting the claimant's subjective allegations of disabling pain lack substantial evidence. Therefore, this court will REVERSE and REMAND the Commissioner's decision.

The court will enter a separate Order in accordance with this Memorandum Opinion.

DONE and ORDERED this 26th day of September, 2017.

**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE